One and all. We have one case on this morning and we look forward to hearing it. Judge Rendell, are you hooked up and all ready to go? I am indeed. Thank you. Wonderful. Council, let's proceed then. May it please the court. My name is David Mitchell with the firm of Manny and Gordon and I represent the appellants Joshua and Elizabeth Panzarella. I would like to reserve three minutes for rebuttal. I'm sorry, three? Yes, sir. Three minutes. Three. Very good. Go ahead, sir. Thank you. My clients, Joshua and Elizabeth Panzarella, brought this case in the lower court as a punitive class action under the Telephone Consumer Protection Act, in relevant part, against Navient. Can we just get something sort of put to the side for a moment? You're not pursuing the FDCPA? Not in this appeal's way. Okay, very good. Thank you. Go ahead. This was brought as a punitive class action against Navient, who is a defendant. They're a student loan company, a student loan servicer. The crux of the case was that my clients, who were non-borrowers, they were not related to Navient in any business capacity, received unwanted auto-dialed calls in an effort to track down somebody else who was a borrower. Our punitive class alleges that Navient made these auto-dialed calls to other people using such things as skip trace technology to try to find the borrowers, and ended up reaching people who were not Navient borrowers. These were, the calls were auto-dialed, but they weren't through a random or sequential program, correct? The specific calls that were made were not, did not use a, pardon me, the phone numbers were not generated by random means. But the issue in this case comes down to the fact that one of the components of the system has that capacity. And that's where it comes, this appeal, the issue here is largely one of statutory interpretation. Okay, so we've been focusing on this capacity versus use issue, right? Right. So let's just zone right in on that. Right. So the inquiry statutorily seems to be whether the ATDS must have the capacity to generate random or sequential numbers versus whether it actually uses the generator. Right. Right? My first question is, isn't capacity, the way the statute is written, a prerequisite to use? Well, the way that the statute has been interpreted by, first of all, the FCC and other circuit courts that have analyzed this question, is that capacity is not so much a prerequisite, but it is language that defines the manner in which the statutory functions must be present in order for a device to constitute an ATDS. If it has the capacity, it is an autodialer. And as the FCC has – So, speaker, your position is the statute prescribes devices that merely have the capacity. If I have the capacity, I'm violative of the statute. Assuming that the calls did not meet some exception to the TCPA, that's correct. All right, so if that's so, then let's look at the statutory language, right? So, A says capacity to store and produce telephone numbers to be called, right? Correct. You with me? Now it's – and then it says using a random or sequential number generator, right? Correct. So, if a random or sequential number generator is not used, have you violated the statute? Our position is yes, and other courts that have looked at this have said the same. We'll see about other courts for a moment. We're going to get to other courts. Okay. Let's just look at the language, right? So, help me now with this, because, you know, all these cases in the Supreme Court and all that, they tell us start with the text. Look at the text. Right. You know, so I want to look at the text. Right. So, when I look at the text, tell me if I took your interpretation, then using a random or sequential number generator would have to be superfluous, yeah? No, I look at it the other way, that if we looked at it on the opposite side of the coin, so as to say that a device that has the capacity but did not use that capacity for a call did not qualify as an auto dialer, then that would render the term capacity superfluous, because otherwise the statute, Congress would have written the statute as a device that uses a random or sequential number generator, or pardon me, a device that stores or produces telephone numbers to be called using a random or sequential number generator, not a device that has the capacity to do so. And the point being, I think that the congressional legislative findings and much of the FCC's interpretations in looking at this, especially as it was articulated in the 2015 order, which this part was not reversed by the ACA decision, it was never touched. In fact, it was deemed unchallenged by the ACA decision in the D.C. Circuit, that the purpose of the word capacity is to prevent or to attempt to prevent companies from or callers from circumventing the statute, so that a device that has the capacity to do both, someone can't just flip it on and flip it off, use the capacity for this call, not for that call, and make it almost impossible to ever parse through which call was made using that capacity, which wasn't, and enforcement of the TCPA would be all but impossible in that case. Well, you say that capacity then is superfluous, but on the other hand, there's also the principle that it would bring about an absurd result if something like the calls that were made to your clients was found to violate the TCPA, because the whole concept is these randomly generated sequential calls. Your situation involves one where it was from a stored list, so it really doesn't fit within what the statute was intended to prohibit, does it? I don't agree with that. I believe that it does. In fact, much of the congressional intent, and I'll go back to what Senator Hollins, the bill's sponsor, stated on the floor of the Senate, that this bill was intended to prevent computerized calls from being made, these calls that were deemed to be the scourge of modern civilization. They wake us up in the morning. They get us out of bed when we're sick. They interrupt us during dinner. They make us want to rip the phone from the wall. It was the computerized nature of the calls that was at issue there, and the fact that these calls were able to be made at a fast rate. The fact that random and sequential number generators were used at some point to make certain telemarketing calls was certainly an issue, but again, the TCPA in its initial congressional findings focused primarily on telemarketing calls, but it has been unanimously agreed to by every court that's looked at it that it does apply to non-telemarketing calls as well, because the statute was intended to be broadly interpreted in favor of consumers as a remedial statute. But then by virtue of having this, you have liability just because you have this equipment that has the capacity? Well, I mean, the fact of the matter is. That's really what you're saying. That's really what you're saying. You're throwing out using a random or sequential and just saying the capacity. If you've got the capacity, you've got a problem, whether or not that capacity was used. Is that correct? That is what the statute says. That's the way the statute is written. Now, whether or not that. You're reading out the last few words. Pardon? You're reading out. Judge Rundell's point is your interpretation reads out of the statute the last few words, right? Using a random or sequential number generator. Well, there are multiple meanings behind what using a random or sequential number generator means also. That's another thing that has not been briefed in this case. It's not an issue, but it has been raised in numerous cases that are pending in the wake of the degreed decision by the Supreme Court. What does using a random or sequential number generator mean? That a random or sequential number generator doesn't state that it has to be a telephone number generator. A random or sequential number generator, as the Supreme Court acknowledged. Well, let's talk about that case. Sure. So Justice Sotomayor says, this is on page 1169 of the Supreme Court reporter. Congress defined an auto dialer in terms of what it must do. Horan store or produce telephone numbers to be called close. And how it must do it using a random or sequential number generator. So it's it's it's two parts. Right. If you just say capacity without using the generator and there has to be random and sequential. How are you violated with the statute? I don't read degreed that way. I see one of the important things that has I think it's been lost on some of the analysis in this case is that what was before the Supreme Court was very limited. It was a petition for writ of certiorari that granted cert to resolve a circuit court split. That split was merely on the one hand, the 11th Circuit and this court from Dominguez, that stated that using a random or sequential number generator modified both preceding verbs store and produced. On the other side of the split was led by the Ninth Circuit that said that using a random or sequential number generator only modified the word produce such that a device was an autodialer if it could store numbers and dial them. Regardless of your recitation of what the case said is is beautiful. But that's not all the case said. Right. So. So on page 1170, Justice Sotomayor said Congress's definition of an autodialer requires that in all cases, whether storing or producing numbers to be called the equipment in question must use a random or sequential number generator. So I would caveat that by noting that what was being discussed in that case was two hypotheticals that were within closed factual universes. So as between this hypothetical dialing system and that one, the Supreme Court interpreted the definition of which antecedent was modified by the using a random or sequential number generator was their interpretation was that they sided with this circuit and the 11th Circuit. Now, what I would point out is that on both ends, like a sandwich, if you will, of this decision, it very clearly states. I'll read from the decision and the opinion starting out to qualify as an automatic telephone dialing system. I'm sorry. What page? Oh, 1167. It's the second paragraph of the opinion. It's actually the last sentence to qualify as an automatic telephone dialing system. A device must have the capacity either to store a telephone number using a random or sequential number generator or to produce a telephone number using a random or sequential number generator. Now, skipping forward to the end, the actual holding of the case. This is on page 11. Let's see, where is this? 1160. No, 1173. It's actually the very last statement, last sentence of the case. We hold that a necessary feature of an auto dialer under 227A1A is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. And the point that I think is critical here is that to interpret this case as inferring a holding on an issue that was never briefed and was never raised by a party or addressed by the court, and what I mean by that is that they would be excising the word capacity from the statute, is something that... Some other courts have modified it a bit. Correct. Then there's 227B, which uses the term use. Right. Why aren't you reading that out? Well, as far as the present capacity issue, I think that that is something we did address in our brief. I think that that was established in the lower court, that the component that we're talking about here had that present capacity. What the district court found, which is nothing we've discussed yet, is that the component that we're dealing with wasn't even part of the system because it was made by the manufacturer of the software. So, therefore, it couldn't be read as that. The fact that it had that present capacity to generate those number tables and the system would dial those didn't render it part of the dialing system. And I think we addressed that at length in our brief in pages 6 to 11, how the actual logistical process, the technological process of this telephony equipment works together in integrated and essential component of this system. So you said the district court got that wrong. That's what you're saying, correct? Correct. Right. Because the system is not the one part of the system. Right. And when we talk about it as a, it's not a, you know, like a cell phone or one, you know, piece of equipment that that's what a dialing system is. It's equipment, which as the definition of equipment so goes, that equipment is the... It has to be used. Well, it's the implements that are used to accomplish a particular purpose. In this case, the purpose of this system was to make outbound calls. Without this component, it cannot make calls. It cannot do anything. It's just a piece of a chunk of hardware. This is a vital integrated component. I analogize it to an automobile. The purpose of a car is to move from point A to point B. Well, there are certain implements in an automobile, an engine, a transmission and a throttle. You take the engine away, it still looks like a car, but it doesn't move. The fact that it is a separate piece of equipment that's integrated into the whole, that may have been made by a different manufacturer is irrelevant to the fact that it is a component of a system as a whole. And I think that the evidence that we established before the district court was unequivocal that this component, this SQL server component, is vital to the operation and functionality of outbound dialing, as this thing was configured by Navient. Well, so your point is that the description by the district court is incorrect, that the SQL and the INI are essentially integrated, and that's the only way to think about them. That was the only issue that was raised. At the time, these other issues that were brought up regarding the Supreme Court's decision degree hadn't happened yet. So the only thing that was at issue in the district court, the only ruling that the court made on summary judgment, was that the device was not a part of the system. The court even acknowledged that our evidence that we submitted on our proffer on summary judgment, established that the device had that present capacity to generate random number tables that could be dialed by the system overall. The court simply said that notwithstanding, it's not a part of the system, so therefore the thing is not a TDS. Can I get back to 227B and your reading of this? Let's say that there's an ambiguity here. And I think Judge Srinivasan in ACCA International posed the question of whether capacity means making any call using, or does it apply to all calls with a device having the capacity? So let's say there's an ambiguity, and we go to the legislative history. In order for you to be correct, we would have to conclude that, oh, Congress really was concerned about the machinery having the capacity. That's what they were concerned about. And if any machinery has that capacity, then you have violated the act, whether or not you've used it. Is that really a plausible reading that, oh, Congress was concerned about the machinery, and if you've got, you know, it may have 16 different capacities, and they may be present capacities, and if that machinery has that capacity, and yet calls weren't made using that capacity, still. Can you really imagine the Supreme Court reasoning that way? Why would you say that that's what the legislature intended? I think it is. And the reason for that is that this technology, when you're dealing with computerized technology, to look at it that precisely would allow for equipment that can do multiple functions, as your Honor said, to evade the scope, the net of the TCPA, if you will, and would allow for violations to occur without any ability to enforce the TCPA, because as the FCC noted in interpreting the same provision, that the purpose of the requirement, the equipment have the capacity to store or produce telephone numbers to be called, is to ensure that the restriction on auto-dial calls not be circumvented. And they looked at the legislative history of that. But ACCA threw that out. ACCA threw that reading out saying this capacity makes a cell phone subject to the law. So that really can't be, can it? Not that particular provision. That wasn't touched by ACA. What ACA looked at was the fact that the FCC's interpretation of what capacity means, not so much whether capacity applies to a device, whether it used that capacity or not, but that the FCC's interpretation of what capacity means was so broad and inclusive that it included potential latent functionality as well as present functionality. And that is what Dominguez and Glaser took issue with. And then, you know, of course the ACA also took issue with that, that it can't be that a device has to have the capacity to store or produce numbers using a random or sequential number generator, and also that it doesn't have to do that and can be modified at some later date by adding hardware or software to it. Well, what's the purpose of the Supreme Court's discussion in Du Bois if not to state unequivocally that the absurd result that would come about merely focusing on capacity isn't what we're talking about? So let me focus you on some language. This is 1171. Justice Sotomayor says, expanding the definition of an auto dialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to nuance problems when Congress meant to use a scalpel. It would capture virtually all modern cell phones. The TCPA's liability provisions then could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses. So if the court was only concerned about capacity, what's the purpose of this discussion of modern cell phones? Because that obviously speaks to use. That's an excellent point, and I think that is really where a lot of the confusion turns here. What is at issue there is that looking at the marks, the Ninth Circuit's interpretation that a device is an ATDS, if it merely has the capacity to store numbers and dial them, right, irrespective of the capacity to generate random or sequential numbers, simply store and dial, then it would automatically render every cell phone an ATDS because every cell phone, everybody's got a contact list in their cell phone. As soon as you make a call, it's an ATDS call. What the ACA decision pointed out, and this is critical, and I think a lot of analysis misses this, the ACA court didn't say that a cell phone could not be an auto dialer. The point was, and Dominguez addressed this too, the point was is when we're talking about capacity, would it require downloading of an app, for instance, that could generate random or sequential numbers and dial those numbers? Sure, that's something that could be done, and if that app was installed and the cell phone generated random numbers and called them, it would be an auto dialer. The point, the issue that ACA and Dominguez had with the FCC's interpretation was that it didn't require that to be the case. Every cell phone in its inherent state right out of the box would be an auto dialer because the future installation or modification at a later date was encompassed within its definition of capacity. So when we look at what the Supreme Court's saying here in terms of looking at that against the backdrop of the ACA, which went into great detail on that definition of capacity, what Justice Sotomayor was concerned with was the same thing the ACA was concerned with, the same thing that this court was concerned with, that if we look at the definition as being so expansive as to render devices that have not been modified to accomplish the statutory purpose of using random and sequential number generators, then everything is going to be an auto dialer except a rotary phone. That's not an issue here in this case. This is a much more narrow focus, and we're talking about a device that has that inherent capacity without modification. In fact, that's one of the intended purposes of a SQL server, which is a database number-printing server originally before it was ever used for these types of applications. It's structured query language is what SQL stands for. You send it a command and actual use means nothing. Pardon? In your interpretation, actual use means nothing. Well, I mean, the fact is that it can do that. I'll point to something that I think is relevant to the scope of why this is important here. One of the issues or one of the facts that we put forward is that while this device has the capacity to generate these 10-digit number tables that can be contactless, that they're dialed out by the other components of this system, central campaign server, outbound dialing server. They all communicate with one another like the car and the transmission. The way this system works is I'll read from our brief. While each campaign might use a separate contactless table, typically these tables are stored in only one database. So you can have simultaneously side-by-side. They can set up tables with preloaded numbers that they've typed in there or uploaded using an Excel sheet, and also simultaneously side-by-side sequentially numbered lists, randomly generated contact lists, and the campaign can be dialed from all of those things at the same time, one call to the next call. And now we've got a device that is using that function and also not using that function at the same time, which is the quagmire that the FCC and the 11th Circuit and Glacier talked about. The enforcement would ultimately effectively be impossible at that point. If we were to look at the question of whether each and every single call that's made was using a function or not using a function based on which table it was drawing numbers from or, you know, to that effect, it's so complicated it's hard to even say. So that's, I mean, that's really I think what it comes down to here is that the capacity is critical here, and the court below did not even address that issue. It simply said that the device wasn't part of the system. So I'm happy to answer any other questions that the court has. I know there was another issue that was raised about the concrete injury. I think that was well addressed for Susino where the issues were very similar to this. Our clients alleged the same exact thing, that there was an invasion of privacy, which is the specific harm that Congress sought to protect consumers from in enacting the TCPA. My clients allege that in paragraphs 34 and 35 of the complaint based on the precedent in Susino and also in later cases, the Manuel v. NRA case, which I know your Honor, Judge Chirica was a part of. That was decided after the Susino case, but it involved exactly the same type of allegations of harm that we're dealing with here, that a call, an unwanted call to a consumer is a concrete injury because that was what Congress sought to protect consumers from in enacting the statute. All right. Judge Lindahl, do you have anything further? I do not, thank you. Okay, very good. Thank you. We will hear from you on rebuttal. Thank you. Good morning. I'm Lisa Simonetti, and I represent Defendant Appellee Navigant Solutions, LLC. Do you want me to start in any particular place where I can respond to some of the things that counsel said? Yeah, like let's chat about capacity and use. The theme of the day. I think that there's no confusion and there's no real difficulty after your degree. I was going to read the language that you read, Judge Greenaway, from 1170-1171. The court said, in all cases, the equipment must use a random or sequential number generator. I think that ends it. It's very, very clear. Isn't that dicta? Isn't that dicta? That's not necessary to the holding. I think that it is, well, dicta in a sense, but I don't believe that capacity was not part of the analysis. If you look at the issue that was framed, the Supreme Court states that it's resolving a conflict among the courts of appeal regarding whether an auto dialer must have the capacity to generate random or sequential phone numbers. So it had the entire definition of ATDS in mind. It's 26 words. You know, it's not super lengthy. So I think that if that... So that would seem to say, then, that capacity is the key and not use. I think they flow together. In order to use something, to implement it, to make it work, there has to be the capacity to do that. Right. But the Supreme Court wasn't concerned with the use. It was concerned with the capacity to store or produce. So the fact that Justice Sotomayor sometimes says must use is not necessary to the analysis. It really was focused on the capacity to store or produce. Correct? Correct. I suppose in a very strict sense. Although having the capacity to store and generate on either side of that phrase, then the court does go on to say it must be used. But setting that aside, even if we're just talking about potential capacity, all of the problems that you have referenced, or maybe present capacity is the better phrase, everyone understands that there's a SQL server attached to this system. It is, in fact, separate, which the district court properly concluded, and it actually relied on plaintiff's own evidence from their expert to get there. But it's a separate piece of equipment. And like any server, can generate numbers. So to your point from earlier, if that capacity and that equipment in any system, integrated system, is enough, then there will never be a system that's not an ATDS. It's impossible. Because you have to have something that provides phone numbers, and that's the SQL server. So I think that's the result that you were talking about that would be the absurdity. And that's why capacity. It was a question, not a statement. Okay. Okay. Understood. But I guess I agreed with the question. I think that that is the result, if that's how you look at it. Let me ask you this question. So let me ask you this question. If we hold that the GWID does not require actual use, what's the best evidence that when you take the SQL and the ININ system, that when combined, they lack the capacity to generate random and sequential numbers? Well, only the SQL server would ever have the capacity to generate numbers. The dialing system, the ININ, is simply the dialer. It just sends the phone calls out. So combining them means what Mr. Mitchell was talking about, interaction. So here we have the loan servicing system where there are borrower records, names, addresses, phone numbers, and all this. It's loaded into the SQL server that stores telephone numbers, not the rest of it. The SQL server passes those numbers over to the dialer and the dialer dials. So it's those three steps. So when I look at the manual, I should not think of the SQL and the ININ as separate pieces. The district court discussed them as separate pieces of hardware. It's really an integrated system. They're separate pieces of equipment. They absolutely are. They communicate as any system. The system in my office has various components, and they communicate. But the different pieces remain different pieces. They just are linked in some way. I mean, the fact that they have to communicate, which plaintiffs concede, tells you that they're separate. They have to communicate. If they were one and the same, they wouldn't have to communicate. They would have a single function. But even plaintiffs' own expert, and going to the manuals, I don't think you should really rely on the manuals at all, to be fair. What else do we look at? No, the proposed expert here never looked at NavientSystem. It doesn't know how the system is actually used. These are just manuals and had no application to the system at issue. And this expert report was proposed late. It was never opposed. But the court considered it anyway. So that's, I think, the value of the report. Are you contending that the district court was correct in saying that the system only includes the ININ and not the S2L? No, I think the overall system includes different pieces of equipment. The SQL server is absolutely one piece. The loan servicing system, its hardware is one piece. And then the dialer itself, the ININ. So you would agree the district court erred in its view of what the equipment means? No, because I think what the district court was looking at, which is correct, is whether the SQL server would have the capacity to use those telephone numbers. And maybe that's the disconnect. The SQL server can only generate numbers. It can't dial. So it could generate numbers from now until eternity, but they would go nowhere unless they were connected to the dialer, but the dialer can't generate numbers. So, yes, it's an integrated system and the parts must work together, but the SQL server itself could never dial a telephone number. No, but why shouldn't we look at equipment as including both parts? I mean, even the plain old definition of equipment, you know, is furnishings or outfit required for required purposes, whatever is need in equipping, articles comprised in an outfit. You know, equipment is everything taken together. How can you separate them? Well, I think you can separate them by function, but if you don't then I think that where you wind up is exactly where you asked the question before. Any system that contains a server, which will be virtually any system in the world, will then have the capacity and the whole thing will be in ATDS. And this statute was enacted in 1991. This technology did not even exist in 1991. So I think part of the struggle here is we're living in the modern world. You know, these are different questions, but I think that's why even if it's not the whole thing, the reference to must use the number generator is really important. It's really important. Well, this was not brought up in the district court. And even in your submission, your supplemental submission, you really hang your hat entirely on DUCA. And really the focus, we've now taken the focus to the concept of using. I mean, Judge Greenway's initial question, using. I think we have three cases for this setting, and I think we have drilled down and peeled onions here. But we've come to this thought of using as being very key. Should we remand for the district court to consider this in the first instance? I don't think that the grade is so far off from Domingo's. I don't know why you would have to do that. I really don't. That is the decision of this court. It's actually what the court based the ruling on, obviously, because Degweed hadn't been issued at that point in time. And so I don't see how that would be useful. Would additional briefing be helpful on the point? Certainly. I mean, if the court would like to see additional briefing, and we can connect the dots between Domingo's and Degweed, but I don't think this changes the world so much. Degweed came down on the Domingo's side of the ledger, and it rejected Mark's and the other cases. So it was a clear circuit split. There weren't distinctions in the positions of the various courts on the different sides of the split. It was one way narrow or the other broad. And the court came down. I'm sorry. I'm sorry. Go ahead. I'm sorry. It's interesting that in Domingo's, it was a situation somewhat like this. The facts really didn't fit with a random sequential situation. It was the fact that the previous owner had subscribed to this SMS system, where you get a text every time you have a phone call. And they hadn't disconnected the system. So this guy kept getting texts and texts and texts. But Domingo's didn't focus on that at all. They didn't focus on the using concept that we're looking at now. Right. And to that point, this is a system that dials from stored lists. Because they're trying to reach specific people, a borrower, a reference, a co-borrower. The concept that it would dial randomly generated numbers or sequentially generated numbers alongside a list of numbers, they would never have a reason to do that. I mean, that is simply that would be nonsense. And then also here, just to make sure we're clear, there were 19 calls. 18 of them were definitely not answered. Maybe one was. It's a little unclear from Mrs. Panzarella whether that happened. But those are the facts here. These are not blast calls. It's not thousands of calls. And these were calls where agents were on the line. They weren't, you know, voice messages or anything like that. So from your perspective, this is a simple opinion. Capacity, use, Navient doesn't use because it doesn't have a random and sequential number generator. So that's basically it. Well, we are not disputing that a SQL server can generate numbers. We're not disputing that. So if you agree that that's a number generator, then you get into all the other issues, you know, whether it's an integrated system and how you look at it. But, you know, strictly speaking, aside from a SQL server, of course, it doesn't have a number generator. It never has. It never would. And a number generator back in 1991 was not a SQL server. It was literally a number generator where someone would turn it on, and it would generate random telephone numbers and just blast them out. And that was a number generator. It was very harassing. In trying to discern what Congress might have been thinking of when they used the term use, especially in 227B, is that helpful in trying to decide whether or not actual use is essential in order to have a cause of action here? I don't know that it's helpful. I think that what Congress was trying to express in 1991 was equipment that could be used or was used to generate numbers, telephone numbers. I think that's what it meant. And, you know, maybe the answer to this entire issue is for Congress to amend the statute. But, you know, that's not something that we can get them to do today. Is there anything else? Your colleague says that reading it the way you want makes capacity superfluous. And it really does. I just don't agree with that. I think it has to go hand in hand. For the system to generate numbers, there has to be the, you can call it capacity, ability, can do, there has to be. Well, but they could have left out that and just said using. The system has been used by the defendant, has used a random or sequential numbers, and that's the prohibited conduct as compared to having the capacity. I mean, if it uses it, it obviously has the capacity. Sure. So you don't even need the concept of capacity. But in order to use it, it has to have capacity. I mean, I would not disagree that this is not, I mean, it's not the best choice of words. It's not written in the clearest way. But the court does say and agreed that it comes to the best interpretation. It's coming to the best, most reasoned interpretation. So we wouldn't have all this litigation over these many years if it were so clear. But it did come to what it thought was the best conclusion. And if the court revisits capacity in this way at that time, I think that Dominguez doesn't make sense. And after DeGweed, I don't understand that at all. That is a problem. And it is our precedent. So the impact of, you know, unless we can say that DeGweed really rendered Dominguez's concern about present capacity somewhat off target, looking at it in that way might be binding on us. Do you want me to address TransUnion at all? The standing issue? I didn't hear you. If you would like to. The standing issue. Do you want me to discuss the TransUnion case at all? I mean, again, it was just 18 calls that were answered, maybe one that was not. And I think that after TransUnion you have to look at whether there would be basically a legal claim, some sort of cause of action that would apply to those facts here. That was not developed at all, of course, in the district court. Anything else? Judge Rendell? Thank you. Nothing. Thank you. Thank you very much. Thank you very much. Thank you. The court would entertain. I would just quickly point out a couple of things. One thing I think is important to consider in all of this, there's a lot of discussion about if we interpret the auto dialer this way or that way, how sweeping would it be? The scope of devices that would be encompassed. It's almost as if this idea that a device could be an ATDS has some type of a chilling effect. What's important to remember here is that the TCPA doesn't make every call a violation. Every call that's made using a system like that a violation. It simply puts the onus on the person who's making that call to ensure that they have the requisite prior express content or that they're calling within one of the exceptions to the TCPA. Simply using a device that has the capacity to perform the functions and thereby making it an ATDS does not then make every call made by that system a violation of the TCPA. If businesses, as Congress pointed out and as the FCC pointed out, if businesses carried their burden that was placed on them by Congress to ensure that they have the proper exceptions, consent, whatnot, then they won't be violating the TCPA. Otherwise, there are other ways in which they can contact borrowers, consumers, telemarketing clients, by picking up a rotary punch 10-digit phone or emails or other various means. That's important. Secondly, as to the issue of whether a component, this component, the SQL server is part of the dialing system, I would just point out a couple of critical things from the manual. I think the manual is dispositive. We received that in response to our discovery request. Navient's 30B6 witness testified that that was the manual for the system that was used to call my clients in the punitive class period. It states, because Interaction Dialer, which is the software program, uses client-slash-server architecture, the software is deployed across servers and workstations that collectively make up the system. That's on page 6 of our brief citing to, I believe, appendix page 500. Now here, two to three dedicated servers are required to implement Interaction Dialer. One, the outbound dialing server, which is a piece of equipment, a server. I'm going to interrupt you for a second. I have page 500 in front of me, and where it says two to three dedicated servers are required to implement the Interaction Dialer. Right. So does that mean that the district court's interpretation of this as two separate pieces of software that essentially are not integrated is incorrect, and that the way to think about this is because the SQL is dependent on the two or three dedicated servers that you have to think about it as an integrated system? And vice versa. Correct. They're dependent on the SQL, and the SQL is dependent on them to collectively accomplish the purpose of making outbound calls. And I think another important thing is, as we cited in page 37 of our brief, another part of the FCC's analysis that was not reversed by the ACA decision. It wasn't touched. It wasn't challenged. It involved liability where entities attempt to separate equipment in order to avoid liability, and that's at the 2015 TCPA order at paragraphs 23 and 24. It states parties cannot circumvent the TCPA by dividing ownership of dialing equipment. It goes on to talk about these two, a beauty salon and a company that was sending messages on its behalf. In effect, the separate equipment divided the storage and calling features functions of these two companies. As a result, these companies alleged that their equipment should not be considered an autodialer because neither system, acting independently, has the capacity to both store or produce numbers and dial those numbers, which is what counsel just presented to the court. That's actually the same argument. The FCC went on to say, we conclude that such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers. The fact that separate entities have voluntarily entered into an agreement to provide such functionality does not alter this. And then it goes on to state the TCPA uses the word system to describe the automated dialing equipment that is defined in Section 227A1. It goes on, as a result, the commission has recognized that when various pieces of different equipment and software can be combined to form an autodialer, as contemplated by the TCPA, the fact that these individual pieces of equipment and software might be separately owned does not change this analysis. Now, the fact that they were separately owned in this hypothetical scenario doesn't change anything in this factual universe here where Navient owns both pieces of equipment. They're simply alleging that they're separate and, therefore, neither one acting in and of itself can perform both statutory functions. If two companies that are separately owning different pieces of equipment can combine to form an autodialer under the FCC's interpretation of this, then certainly one company that owns both pieces and is using them together as an integrated whole, a collective system, constitutes an autodialer. The error of the district court, in your view, in thinking of them as separate is that the thinking of them as separate evades liability because neither could be an ATDS, but if they were thought of as one system, then they, in your view, the error is if they were thought of as one system, that would be an ATDS. Correct. Exactly. If Congress intended that autodialing, which is what happened to your clients were autodialed, used with stored numbers, not using random or sequential, if Congress sought to prohibit autodialing, which is what happened, which are, you know, they're nuisance calls as well, why would they include the statutory language of using random or sequential? Well, I think there's another important point here, and I would direct the court to the amicus filing that was recently filed by EPIC and the National Consumer Law Center regarding this court undertaking the task of interpreting what using a random or sequential number generator means. Because as some of the amicus filings demonstrated and presented to the court and degreed, back in 1991, even as far back as that, and certainly today, using a random or sequential number generator doesn't necessarily mean making telephone numbers. Random and sequential number generation is also inherent in data storage for, in other words, a system that is making calls, outbound calls, that stores things in its temporary RAM using random number generation. Are you saying that the calls made to your clients were random? No, that's not what I'm saying. The calls, the numbers, certainly the calls were made on purpose. The point that we're saying, why did Congress include using a random or sequential number generator in the statute? What that term actually means and what Congress was envisioning when it used using a random or sequential number generator didn't necessarily mean that it had to dial random or sequential telephone numbers, because random and sequential number generators were at that time used to do things other than create telephone numbers. In other words, and that was addressed in degreed in one of the footnotes, that random and sequential number generators can be used to select the order in which telephone numbers are called. But just to be clear, you are not contending that the calls made to your clients were made using a random or sequential number generator, are you? No, Judge Rendell, we're not contending that. All right, very good. Thank you so much. Thank you, John. Counsel, thank you for an interesting argument today. I had fun. And we'll take the matter under advisement. Thank you. Thank you. I think he took his own.